**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**

| | | |
|---|---|---|
| JOHNNY McCLURG,<br>on Behalf of Himself and All<br>Others Similarly-Situated,<br><br>    *Plaintiff,*<br><br>v.<br><br>DALLAS JONES ENTERPRISES<br>INC, d/b/a CLAY'S TRUCKING,<br>DANA PORTER, BROCK PORTER,<br>and DALLAS JONES,<br><br>    *Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **PROPOSED COLLECTIVE ACTION**<br>**UNDER FLSA AND CLASS ACTION**<br>**UNDER KWHA**<br><br> CASE NO.    4:20-cv-201-JHM<br><br>**JURY DEMANDED** |

**THIRD AMENDED COLLECTIVE AND CLASS ACTION COMPLAINT**

Comes Plaintiff Johnny McClurg, by and through counsel, and, for his Third Amended Collective and Class Action Complaint against Defendants Dallas Jones Enterprises, Inc. d/b/a Clay's Trucking (this first Defendant is referred to herein as the "Defendant"), Dana Porter, Brock Porter, and Dallas Jones (these latter three Defendants are hereinafter collectively referred to as the "Individual Defendants"), states as follows:

### I.    Summary of the Action

1.    Plaintiff was employed by Defendant as a truck driver.  Plaintiff worked overtime in many workweeks but was not paid overtime compensation for his overtime work because Defendant incorrectly classified Plaintiff as exempt under the Motor Carrier's Act exemption to the Fair Labor Standards Act (the Act is at 29 U.S.C. § 201 *et seq.* and is referred to herein as the "FLSA", the Motor Carrier's Act exemption is at 29 U.S.C. § 213(b)(1) and is referred to herein as the "MCA exemption") and Kentucky Wages and Hours Act (the Act is at K.R.S. Chapter 337, and

is referred to herein as the "KWHA", the exemption is at K.R.S. § 337.285(2)(c) and expressly refers to "[e]mployees as defined and exempted from the overtime provision of the Fair Labor Standards Act in Sections 213(b)(1)", and accordingly is referred to herein by the same reference to "MCA exemption").   However, the exemption did not apply to Plaintiff for two reasons: Defendant was not an interstate motor carrier eligible to use the MCA exemption and Plaintiff did not drive in "interstate commerce" as defined under the Motor Carrier's Act.   Like Plaintiff, other workers similarly performed overtime work for Defendant and were not paid overtime compensation as required by the FLSA based on Defendant's incorrect classification of those employees as exempt under the MCA exemption.   The Individual Defendants controlled Defendant and caused Defendant to violate the FLSA and KWHA and accordingly should be held jointly and severally liable with Defendant for the Defendant's violations.

## II.   Jurisdiction and Venue

2.     This Court has jurisdiction over the claims of Plaintiff and those similarly situated pursuant to 28 U.S.C. §§ 1331 and 1337 and 29 U.S.C. § 216(b).

3.     This Court has and should exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's claims under the KWHA because they are so related to Plaintiff's claims under the FLSA that they form part of the same case or controversy and arise from the same set of operative facts as Plaintiff's claims under the FLSA.

4.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants conducted business within the District and, from Defendant's principal place of business in Muhlenberg County, Kentucky (within the District of this Court), employed Plaintiff (who resides in Hopkins County, Kentucky, within the District of this Court) and other similarly-situated employees who worked within the District of this Court and, specifically, employed truck drivers

delivering coal and garbage from locations in Kentucky to locations in Kentucky, including from a coal mine in Ohio County, Kentucky (within the District of this Court) to a power plant located in Ohio County, Kentucky (within the District of this Court).

### III.    Parties

5.     Plaintiff Johnny McClurg is a resident of Hopkins County, Kentucky.

6.     During the three (3) year period prior to the filing of Plaintiff's initial Complaint in this matter, Plaintiff was employed by Defendant as a truck driver performing work that was not exempt from the requirements of the FLSA, and during the five (5) year period prior to the filing of the initial Complaint in this matter, Plaintiff was employed by Defendant as a truck driver performing work that was not exempt from the requirements of the KWHA.

7.     Pursuant to 29 U.S.C. § 216(b), Plaintiff McClurg has consented in writing to serving as a Plaintiff in this action, and Plaintiff's consent was attached to Plaintiff's initial Complaint filed in this action (Ct. Doc. 1) as Exhibit 1.

8.     Defendant Dallas Jones Enterprises, Inc. is a Kentucky for-profit corporation which operates under the assumed name of Clay's Trucking, has a principal place of business at 3326 Merle Travis Highway, Beechmont, KY, and may be served by service of process on its registered agent, Dallas Jones, at 3326 Merle Travis Highway, Beechmont, KY 42323.

9.     Defendant Dana Porter is an individual resident of the Commonwealth of Kentucky who, upon information and belief, may be served by service of process at 3326 Merle Travis Highway, Beechmont, KY 42323.

10.     Defendant Brock Porter is an individual resident of the Commonwealth of Kentucky who, upon information and belief, may be served by service of process at 3326 Merle Travis Highway, Beechmont, KY 42323.

11.     Defendant Dallas Jones is an individual resident of the Commonwealth of Kentucky who, upon information and belief, may be served by service of process at 3326 Merle Travis Highway, Beechmont, KY 42323.

12.     Defendant is subject to the FLSA's "enterprise coverage," under which all employees of an enterprise engaged in interstate commerce (as defined in the FLSA[1]) are covered by the FLSA, whether or not each individual employee is involved in work in interstate commerce (as defined in the FLSA).  29 U.S.C. § 203 (r), (s).

13.     At all times relevant to this Complaint, Defendant has had at least two employees.

14.     Defendant's annual sales have, at all relevant times to this Complaint, exceeded $500,000.00.

15.     While the freight moved in trucks by Plaintiff and the other similarly-situated truck driver employees of Defendant does not move in "interstate commerce" as that term is defined in the Motor Carrier's Act, Defendant has, at all times relevant, employed two or more employees who, as part of their work, handle or otherwise work on goods or materials that have been moved in interstate commerce.

---

[1]     The Fair Labor Standards Act contains different definitions of "interstate commerce" than the Motor Carrier's Act.  *See* 29 C.F.R. § 782.7 ("section 13(b)(1) of the Fair Labor Standards Act does not exempt an employee of a carrier from the act's overtime provisions unless it appears, among other things, that his activities as a driver, driver's helper, loader, or mechanic directly affect the safety of operation of motor vehicles in transportation in interstate or foreign commerce within the meaning of the Motor Carrier Act. What constitutes such transportation in interstate or foreign commerce, sufficient to bring such an employee within the regulatory power of the Secretary of Transportation under section 204 of that act, is determined by definitions contained in the Motor Carrier Act itself. These definitions are, however, not identical with the definitions in the Fair Labor Standards Act which determine whether an employee is within the general coverage of the wage and hours provisions as an employee "engaged in (interstate or foreign) commerce." For this reason, the interstate commerce requirements of the section 13(b)(1) exemption are not necessarily met by establishing that an employee is "engaged in commerce" within the meaning of the Fair Labor Standards Act when performing activities as a driver, driver's helper, loader, or mechanic, where these activities are sufficient in other respects to bring him within the exemption"); *see also* American Bar Association, Section of Labor and Employment, Fair Labor Standards Legislation Committee, Ch. 6.III.A.3.c (i) . ("[t]he definition of 'interstate or foreign commerce' under the MCA is not identical to the definition of 'interstate or foreign commerce' ending under the FLSA.... Consequently, transportation by motor vehicle that is in 'interstate commerce' under the FLSA may not constitute transportation over which the DOL has the power to exercise control and upon which the Section 13(b)(1) exemption is based").

16.     Specifically, Plaintiff and the similarly-situated employees handle, as part of their work, fuel for the trucks that has moved in interstate commerce.

17.     Further, upon information and belief, Plaintiff and the similarly situated employees drove (in Kentucky) trucks that were built in other states of the United States.

18.     Defendant is an enterprise engaged in commerce or in the production of goods for commerce, as defined in 29 U.S.C. § 203.

### IV.     Factual Allegations

19.     The exemption of an employee from the hours provisions of the Fair Labor Standards Act under the MCA exemption depends both on the class to which his or her employer belongs and on the class of work involved in the employee's job.

20.     Defendant does not belong to the class of employers entitled to exempt its employees from the overtime requirements of the FLSA; specifically, the MCA exemption does not apply to employees of carriers who are not carriers subject to the jurisdiction of the United States Department of Transportation, and Defendant was and is not an interstate motor carrier and was and is not subject (and has held itself out as not subject) to the jurisdiction of the United States Department of Transportation under the Motor Carrier's Act.

21.     Further, the type of work performed by Plaintiff and the similarly-situated employees did not support the application of the exemption; they drove trucks, but drove them solely in Kentucky and did not drive them in interstate commerce as defined in the Motor Carrier's Act.

22.     The Individual Defendants controlled the Defendant and caused it to engage in violations of the FLSA and KWHA, and accordingly should be held jointly liable with the Defendant for the Defendant's violations.

23.     These issues are addressed in turn below.

**A.     Defendant is Not an Interstate Motor Carrier and Is Therefore Ineligible to Assert the MCA exemption.**

24.     Defendant is not an interstate motor carrier, and therefore it is ineligible to assert that its employees are exempt from the overtime requirements of the FLSA and/or KWHA under the MCA exemption (regardless of the activities of the employees).

25.     Indeed, Defendant itself represented to the United States Department of Transportation Federal Motor Carrier Safety Administration ("FMCSA") that it and its drivers did not operate in interstate commerce (as defined in the Motor Carriers Act) and instead operated "intrastate" only.

26.     Specifically, while carriers who are intrastate only are not required by federal law to apply for a U.S. Department of Transportation number, the state law of certain states, including Kentucky, requires all carriers, including "intrastate only" carriers operating solely within that state and not engaging in interstate commerce (as defined in the Motor Carrier's Act), to obtain a U.S. Department of Transportation number.

27.     FMCSA has accordingly designed Form MCS-150, which is FMCSA's form of application for a U.S. Department of Transportation number and which allows carriers to represent to the federal government whether the applicant is engaged in interstate commerce (and thus will be subject to federal regulation) or is "intrastate" only (and thus not subject to federal regulation, but instead seeking the U.S. Department of Transportation number to comply with state law).

28.     A copy of the form of Form MCS-150 which FMCSA makes available and requires applicants for and holders of U.S. Department of Transportation numbers to use (as revised December 13, 2020) was attached to Plaintiff's Second Amended Complaint in this matter (Ct. Doc. 41 as Exhibit 1 (Ct. Doc. 41-1).

29.     FMCSA includes the instructions to Form MCS-150 in the same file as the Form MCS-150 itself; upon information, at all times relevant (i.e., from the last Form MCS-150 Defendant filed prior to December 7, 2015 to the present), FMCSA has included the instructions to Form MCS-150 in the same file as the Form MCS-150 itself so that any person downloading Form MCS-150 would automatically also download the instructions.

30.     Upon information and belief, Defendant completed numerous Forms MCS-150 using the form attached to the Second Amended Complaint (Ct. Doc. 41) as Exhibit 1 (Ct. Doc. 41-1) (or using prior versions of Form MCS-150) and submitted them to FMCSA.

31.     Upon information and belief, even while this litigation was pending, Defendant submitted a Form MCS-150 to FMCSA, which was received by FMCSA on or about April 19, 2021.

32.     Upon information and belief, Defendant received and reviewed the instructions for Form MCS-150 (PDF pages 1 through 8 and numbered-at-the-bottom-of-the-page pages i through viii the form attached to Plaintiff's Second Amended Complaint (Ct. Doc. 41) as Exhibit 1 (Ct. Doc. 41-1)), or equivalent prior versions of those instructions, prior to submitting its Form MCS-150 received by FMCSA on or about April 19, 2021.

33.     Further, upon information and belief, Defendant received and reviewed the same instructions for Form MCS-150 (or equivalent instructions for the versions of Form MCS-150 used by Defendant) prior to submitting Defendant's earlier Forms MCS-150 to FMCSA (i.e., Defendant's Forms MCS-150 submitted prior to April, 2021).

34.     Upon information and belief, each and every Form MCS-150 submitted by Defendant to FMCSA was signed under penalty of perjury.

35.     Accordingly, upon information and belief, Defendant knew that, if it submitted a Form MCS-150 without the box labelled "Interstate Carrier" checked (in section 22 of Second Amended Complaint Exhibit 1 (Ct. Doc. 41-1) and/or equivalent sections of prior versions of Form MCS-150), Defendant was representing to FMCSA under penalty of perjury that it was not involved in and did not plan to be involved in "interstate commerce" as defined in the Motor Carrier's Act.

36.     Further, upon information and belief, Defendant knew that, if it submitted a Form MCS-150 without the box labelled "Interstate Carrier" checked (in section 22 of Second Amended Complaint Exhibit 1 (Ct. Doc. 41-1) and/or equivalent sections of prior versions of Form MCS-150), Defendant was representing to FMCSA under penalty of perjury that it was not involved in and did not plan to be involved in "interstate commerce" as defined in the instructions to Section 22 of Form MCS-150 (and/or the instructions to equivalent sections of prior versions of Form MCS-150).

37.     Both Section 22 of Form MCS-150 (as revised December 13, 2020) and the instructions to Section 22 of Form MCS-150 (as revised December 13, 2020) expressly stated that the company completing the form should "check" or "select" "all that apply" from among the list of categories of "Company Operations" shown in Section 22, which included a category of "Interstate Carrier" and a separate category of "Intrastate Non-Hazmat Carrier".

38.     The instructions to Section 22 of Form MCS-150 (as revised December 13, 2020) expressly stated that a company should check "Interstate Carrier" under the following circumstances:

A.     Interstate Carrier – The company is an Interstate Carrier if any part of its operation transports property or passengers in support of interstate commerce, i.e., the property or passengers cross State lines either before the company received them, while the company is transporting them, or after the company has transferred the property or passengers.  The transportation of the property or passengers may include transport by plane, train, or boat in addition to the company's commercial

motor vehicle.  For example: if the origination and destination indicated on the bill of lading – when one exists – are not in the same State, then the shipment is interstate and the company needs to be registered as an Interstate Carrier.

The company is also considered to be an Interstate Carrier if the property or passengers being transported will ever do ANY of the following:

- Cross State lines (including a place outside the United States)
- Move from the United States or a U.S. territory to a foreign country, or vice versa
- Have origination and destination points within a State, but pass through another State or foreign country during transport.

39.    Upon information and belief, each and every Form MCS-150 submitted by Defendant to FMCSA included (in section 22 of Second Amended Complaint Exhibit 1 (Ct. Doc. 41-1) and/or equivalent sections of prior versions of MCS-150) a check to the box labelled "Intrastate Non-Hazmat Carrier".

40.    Upon information and belief, each and every Form MCS-150 submitted by Defendant to FMCSA included (in section 22 of Second Amended Complaint Exhibit 1 (Ct. Doc. 41-1) and/or equivalent sections of prior versions of MCS-150) no check on the box labelled "Interstate Carrier".

41.    Upon information and belief, each and every Form MCS-150 submitted by Defendant to FMCSA included a number of drivers only under the "Intrastate" column of section 27 of Second Amended Complaint Exhibit 1 (Ct. Doc. 41-1) (and/or equivalent sections of prior versions of MCS-150), and included no number of drivers (or a zero) under the "Interstate" column of section 27 of Second Amended Complaint Exhibit 1 (Ct. Doc. 41-1)1 (and/or equivalent sections of prior versions of MCS-150).

42.    In other words, upon information and belief, each and every Form MCS-150 submitted by Defendant to FMCSA represented to FMCSA under penalty of perjury that all of its drivers were not involved in interstate commerce.

43.     FMCSA has developed a Safety and Fitness Electronic Records ("SAFER") system to provide information to the public about U.S. Department of Transportation number holders.

44.     Attached as Exhibit 2 to Plaintiff's Second Amended Complaint in this matter (Ct. Doc. 41-2) is FMCSA's description of the SAFER system, as maintained on FMCSA's website (as of August 18, 2021).

45.     Upon information and belief, FMCSA includes in the information displayed through its SAFER system the information each applicant for a US Department of Transportation number provides to FMCSA on the Form MCS-150 required for applying for (and required to be filed periodically thereafter by holders of) a US Department of Transportation number.

46.     Accordingly, upon information and belief, where FMCSA's SAFER system displays for a company's "Company Operations" that a company is "Intrastate Only (Non-HM)" and not "Interstate," the SAFER system does so based on the information represented by that company to FMCSA under penalty of perjury on the company's latest Form MCS-150 (and, specifically, because the company checked "Intrastate Non-Hazmat Carrier" and did not check "Interstate Carrier" under the "Company Operations" section on the company's latest Form MCS-150.

47.     Attached to Plaintiff's Second Amended Complaint in this matter as Exhibit 3 (Ct. Doc. 41-3) are search results for Defendant on the FMCSA's SAFER system reflecting the content of FMCSA's management information systems for Defendant as of July 1, 2021.

48.     The results reflect that Defendant is "Intrastate Only."

49.     In contrast to Defendant's representations to FMCSA that it was not involved in interstate commerce, upon information and belief, two sister companies of Defendant under common ownership and control with Defendant, DC Trucking, Inc. and DC Transport, Inc., represented to FMCSA that they were engaged in interstate commerce.

50.     Specifically, attached to Plaintiff's Second Amended Complaint in this matter as Exhibit 4 (Ct. Doc. 41-4) are search results for DC Trucking, Inc. on the FMCSA's SAFER system reflecting the content of FMCSA's management information systems for Defendant as of July 1, 2021.

51.     Further, attached to Plaintiff's Second Amended Complaint in this matter as Exhibit 5 (Ct. Doc. 41-5) are search results for DC Transport, Inc. on the FMCSA's SAFER system reflecting the content of FMCSA's management information systems for Defendant as of August 11, 2021.

52.     Plaintiff does not seek in this action to assert that employees of DC Trucking, Inc. and DC Transport, Inc., while driving for those companies,[2] were similarly-situated to Plaintiff; instead, Plaintiff references those companies to illustrate that Defendant's management, which also managed the separate entities of DC Trucking, Inc. and DC Transport, Inc., knew how to represent to the federal government that an entity was involved in interstate commerce under the Motor Carrier's Act, and represented to the federal government the opposite with respect to Defendant: they represented that Defendant was not involved in interstate commerce under the Motor Carrier's Act.

53.     In the alternative, even if Defendant was an interstate motor carrier eligible to assert the Motor Carrier Act exemption (it was not as addressed above), Defendant, having represented to the United States Department of Transportation under penalty of perjury that it was not operating in interstate commerce, should be barred by the doctrines of judicial estoppel and unclean hands

---

[2]     Upon information and belief, there were employees of Defendant and who were also employees of one or both of DC Trucking, Inc. and DC Transport, Inc.  Those employees were similarly-situated to Plaintiff while they were driving for Defendant, even if they drove for DC Trucking, Inc. and/or DC Transport, Inc during the same workweek.

from asserting in this action that it qualifies as a motor carrier subject to the jurisdiction of the Department of Transportation eligible to assert the Motor Carrier Act exemption.

### B.      Plaintiff and Similarly-Situated Employees Did Not Drive in Interstate Commerce.

54.      Even setting aside Defendant's own status (as not being an interstate motor carrier), the MCA exemption did not apply to the work of Plaintiff and the other employees of Defendant for two reasons.

55.      First, Defendant's management steered all interstate commerce business to two sister (non-Defendant) companies which were licensed to engage in interstate commerce, and instead had the truck driver employees of Defendant work exclusively on Kentucky-only non-interstate commerce loads.

56.      Second, Plaintiff and other employees of Defendant had special medical cards that only allowed them to drive in intrastate commerce, and Defendant was legally prohibited from using these employees in interstate commerce.

57.      These issues are addressed in turn below.

**1.      None of Defendant's Employees Drove In Interstate Commerce; Defendant's Management Instead Had Sister (Non-Defendant) Companies Drive Any Interstate Commerce Loads.**

58.      Plaintiff worked for Defendant; Plaintiff did not drive trucks for or otherwise work for DC Trucking, Inc. or DC Transport, Inc.

59.      Defendant's management were also the management of DC Trucking, Inc. and DC Transport, Inc.

60.      Defendant was not authorized by the federal government to engage in interstate commerce as defined in the federal Motor Carrier's Act.

61.      Upon information and belief, Defendant did not have insurance that would provide it with coverage for activities engaging in interstate commerce as defined in the federal Motor Carrier's Act.

62.     In contrast, DC Trucking, Inc. and DC Transport, Inc. were authorized by the by the federal government to engage in interstate commerce as defined in the federal Motor Carrier's Act (and, upon information and belief, had insurance that would provide them with coverage while doing so).

63.     Therefore, Defendant's management (who, again, were also the management of DC Trucking, Inc. and DC Transport, Inc) would ensure that Defendant did not drive any loads that qualified as interstate commerce under the Motor Carrier's Act, and would ensure that any such loads would be driven exclusively by employees of DC Trucking, Inc. and/or DC Transport, Inc.

64.     Therefore, Plaintiff and the other employees who worked for Defendant and did not work for DC Trucking, Inc. or DC Transport, Inc. reasonably expected that they would never be called upon (and in fact were never called upon) to drive truck loads or otherwise perform work involving interstate commerce (as defined in the Motor Carrier's Act); instead the expectation of all (including Plaintiff, the other employees of Defendant, and Defendant's management) was that any work involving interstate commerce would be performed solely by employees of DC Trucking, Inc. and/or DC Transport, Inc.[3]

65.     For example, Plaintiff, during the three years preceding the filing of the initial Complaint in this action, was, for a period of time, regularly and exclusively assigned by Defendant to deliver coal from a coal mine near Centertown, Kentucky to the Big Rivers Wilson Power Plant near Island, Kentucky.  Plaintiff's work for Defendant during this period of time is referred to herein as the Big Rivers Run Period.

---

[3]     Upon information and belief, there were some employees who performed some work for Defendant and other work for DC Transport, Inc. or DC Trucking, Inc.  For the same reasons, those employees reasonably expected that they would never be called upon (and in fact were never called upon) to drive truck loads or otherwise perform work involving interstate commerce (as defined in the Motor Carrier's Act) for Defendant; instead, they would perform interstate commerce work only while working for DC Transport, Inc. or DC Trucking, Inc., and would only perform non-interstate commerce work while working for Defendant.

66.     During the Big Rivers Run Period, Plaintiff was exclusively delivering coal that was mined in Kentucky, transported solely within Kentucky, and delivered to a Kentucky power plant facility which, at the time of the delivery, intended to use the coal solely within the Commonwealth of Kentucky; the coal ultimately was in fact used solely within the Commonwealth of Kentucky by the power plant burning the coal in the Commonwealth of Kentucky for electric power production.

67.     Because Plaintiff was driving the truck solely within the Commonwealth of Kentucky to deliver coal from a Kentucky mine (where it was removed from the earth in the Commonwealth of Kentucky) to another location within the Commonwealth of Kentucky where it would be burned and sent into the atmosphere, Plaintiff's work driving said truck was not work in "interstate commerce" as defined under the Motor Carrier's Act.

68.     After the Big Rivers Run Period, Plaintiff was assigned different duties, but, like the duties during the Big Rivers Period, these duties likewise did not involve driving loads in interstate commerce (as defined in the Motor Carrier's Act).

69.     For instance, during this later period after the Big Rivers Run Period, Plaintiff continued to deliver coal that had been mined in Kentucky from Kentucky locations to the Big Rivers Wilson Power Plant, but also in some weeks picked up coal that had been mined in Kentucky and was destined to a purchasers/end-users in Kentucky, and drove that coal exclusively through Kentucky to locations in Kentucky.

70.     As another example, Big Rivers would sometimes request that coal be loaded onto barges at a barge load out facility, which was located in Kentucky near the Big Rivers Wilson Power Plant, so that Big Rivers could later convey the coal directly into the Big Rivers Wilson Power Plant using equipment it had to unload coal from barges; when this occurred, all parties were aware that the coal, which originated in a coal mine in Kentucky, despite being loaded onto a barge in

Kentucky, would not be transported out of Kentucky but would instead be moved a short distance on the river (entirely within the Commonwealth of Kentucky) to Big Rivers's barge intake equipment to be burned in Kentucky.

71.     Plaintiff also delivered coal to loadout facilities to be stored in piles at the loadout facilities to dry or otherwise be stored; when coal was stored in this method, it was segregated into piles based on the intended ultimate destination of the coal; although there might be at these facilities separate piles of coal transported by other companies that was destined for out-of-state locations, Plaintiff and other employees of Defendant would only deliver to these facilities coal that was intended for an end-use in Kentucky, and the coal thus delivered by Defendant's employees was segregated for that purpose.

72.     For example, if coal was wet due to rain, Big Rivers would, in order to avoid paying for the excess moisture (most purchasers of coal buy by the ton), sometimes direct that coal not be delivered.

73.     On these days, Defendant would have Plaintiff move coal ultimately destined to the Big Rivers Wilson Power Plant to a storage pile at a loadout facility; one or more particular piles were "set aside" for storage of such coal destined to the Big Rivers Wilson Power Plant and, despite being stored at a loadout facility from which the coal, as a practical matter, could be shipped out of state, such coal in the set-aside piles would never be shipped out of state but instead would be delivered (presumably after it dried) by truck on another day to the Big Rivers Wilson Power Plant.

74.     In other words, Plaintiff delivered coal to loadout facilities which was not actually "loaded out" to a barge or rail form of transportation, but instead simply stored in a pile at the loadout facility before being later delivered in Kentucky for use in Kentucky.

75.     Upon information and belief, like Plaintiff, all of the other truck driver employees of Defendant performed exclusively work that did not involve driving loads in interstate commerce (as defined in the Motor Carrier's Act), but were improperly classified by Defendant as exempt and not paid overtime compensation.

76.     In the alternative, even if Defendant had Plaintiff and/or other truck driver employees of Defendant sometimes drive in interstate commerce (it did not as addressed above), Defendant, having represented to the United States Department of Transportation under penalty of perjury that none of its employees were operating in interstate commerce, should be barred by the doctrines of judicial estoppel and unclean hands from asserting in this action the opposite (that those same employees were operating in interstate commerce).

77.     Further, in alleging details relevant to the applicability of the MCA exemption; Plaintiff notes that the burden of proving that the exemption applies (including proving that the employee was performing work in interstate commerce) is on the Defendant; thus, in the alternative, to the extent Defendant is found not to be barred by the doctrines of judicial estoppel and unclean hands from asserting in this action the opposite of what it represented under penalty of perjury to the federal government, and to the extent that Defendant further establishes that Plaintiff and/or similarly-situated employees drove in interstate commerce, but only establishes such facts with respect to particular time periods, Plaintiff and the similarly-situated employees should be awarded overtime compensation for all other time periods.

**2.     Defendant Was Legally Prohibited from Having Plaintiff and Other Employees With Kentucky "Intrastate Only" Medical Cards Work in Interstate Commerce, and Did Not Do So.**

78.     Plaintiff has worked as a truck driver for many years.

79.     Around the year 2007, Plaintiff was diagnosed with diabetes.

80.     After Plaintiff was diagnosed with diabetes, for which Plaintiff was prescribed insulin administered by an insulin pump, Plaintiff approached Defendant.

81.     As a result of Plaintiff's diabetes diagnosis and insulin prescription, Plaintiff was legally prohibited from driving a vehicle requiring a commercial driver's license unless Plaintiff obtained one or more medical waivers.

82.     There is a process for persons with diabetes to seek a medical waiver from the federal Department of Transportation to obtain the right to operate a vehicle requiring a commercial driver's license in interstate commerce (as defined in the federal Motor Carriers Act); however, Plaintiff did not obtain such a waiver from the federal government, either before or during his employment with Defendant.

83.     Instead, with Defendant's assistance, Plaintiff applied for a medical waiver from the Commonwealth of Kentucky to authorize Plaintiff to operate vehicles requiring a commercial driver's license solely in intrastate commerce (i.e., not in interstate commerce as defined in the federal Motor Carrier's Act).

84.     When Plaintiff discussed with Defendant's management the possibility of Plaintiff being employed by Defendant prior to Plaintiff's employment, Plaintiff and Defendant's management specifically discussed Plaintiff's diabetes diagnosis, Plaintiff's insulin use, Plaintiff's eligibility for a medical waiver from the Commonwealth of Kentucky, and that Plaintiff did not have any medical waiver from the federal government.

85.     Attached to Plaintiff's Second Amended Complaint in this matter as Exhibit 6 (Ct. Doc. 41-6) is Plaintiff's application, which was also signed by Defendant, applying for Commonwealth of Kentucky to authorize Plaintiff to operate vehicles requiring a commercial

driver's license solely in intrastate commerce (i.e., not in interstate commerce as defined in the federal Motor Carrier's Act).

86.     As a result of this application, Plaintiff received the applied-for waiver; attached to Plaintiff's Amended Complaint in this action (Ct. Doc. 7) as Exhibit 2 are cards Plaintiff received from the Kentucky Transportation Cabinet noting that Plaintiff's medical waiver was granted.

87.     Each of the cards specifically notes in all-capital, bold font that **"THIS WAIVER VALID DURING INTRASTATE COMMERCE ONLY."**

88.     Prior to Plaintiff beginning to perform work, and throughout Plaintiff's employment with Defendant, Defendant received and maintained copies of Plaintiff's medical waiver cards from the Kentucky Transportation Cabinet (attached as Exhibit 2 to Plaintiff's Amended Complaint (Ct. Doc. 7), or the equivalent predecessor or successor card(s)),

89.     Plaintiff and Defendant agreed during their discussions regarding Plaintiff's employment that Defendant could hire Plaintiff only to operate vehicles in intrastate commerce (activity that was not interstate commerce under the Motor Carrier's Act), and that Plaintiff was not legally authorized to operate vehicles requiring a commercial driver's license in intrastate commerce, and that Plaintiff would be hired to drive trucks solely in intrastate commerce.

90.     Upon information and belief, Defendant employed other employees with Kentucky "intrastate only" medical waivers, and similarly was legally able to (and did) only employ those employees in driving that was not in interstate commerce.

91.     Plaintiff's and the other employees of Defendant with Kentucky "intrastate only" medical waivers had a reasonable expectation that they would never be called upon by Defendant to (and in fact were never called upon to) perform truck driving in interstate commerce (as defined in the Motor Carrier's Act), including because both Defendant and the employees were aware that

Defendant was legally prohibited from assigning such employees to perform truck driving in interstate commerce and because such employees were not legally permitted to drive trucks in interstate commerce.

92.     In the alternative, even if Defendant had Plaintiff and the similarly-situated employees who also had Kentucky "Intrastate Only" medical waiver cards sometimes drive in interstate commerce (it did not as addressed above), Defendant, having represented to the United States Department of Transportation under penalty of perjury that none of its employees were operating in interstate commerce, and having represented to the Kentucky Department of Transportation that the work of these employees would be solely in intrastate commerce, should be barred by the doctrines of judicial estoppel and unclean hands from asserting in this action the opposite (that those same employees were operating in interstate commerce).

### C.     Plaintiff and the Similarly-Situated Employees Were Not Paid Overtime Compensation.

93.     Defendant paid Plaintiff and its other truck-driver employees based on a formula that supposedly paid the employee a percentage of the amount Defendant earned from delivering the loads driven by the employee

94.     The amount paid by Defendant thus corresponded with the amount received by Defendant for the loads being delivered.

95.     Defendant was paid for the coal and other loads being delivered on a per-ton basis, and, therefore, Defendant paid Plaintiff and the similarly-situated employees on a per-ton basis for delivering loads.

96.     Defendant did not pay Plaintiff and/or the similarly-situated employees a higher per-ton rate for deliveries performed during times when the employee was working in excess of forty hours in a particular workweek.

97.     To the contrary, when Plaintiff and the similarly-situated employees would work more than forty hours in a workweek, which they frequently did, the employee would continue to be paid at the same per-ton rate for deliveries made after having worked more than forty hours in the workweek as the employee had been paid for deliveries made during the first forty hours in the workweek.

### D.     The Individual Defendants Controlled Defendant Dallas Jones Enterprises, Inc. and Should Be Held Jointly Liable with Defendant Dallas Jones Enterprises, Inc. for Defendant Dallas Jones Enterprises, Inc.'s Violations of the FLSA and KWHA

98.     The Individual Defendants controlled Defendant Dallas Jones Enterprises, Inc. and should be held jointly liable with Defendant Dallas Jones Enterprises, Inc. for Defendant Dallas Jones Enterprises, Inc.'s violations of the FLSA and KWHA.

99.     The Individual Defendants each exerted substantial operational control over Defendant and Defendant's employment policies, and, specifically, over requiring workers to work more than 40 hours per week, being aware that workers were working more than 40 hours per week, and causing Defendant to pay Defendant's truck driver employees on a percentage-of-load (effectively a per-ton basis) without any additional compensation to workers for work performed in excess of 40 hours in the workweek.

100.    The Individual Defendants each acted directly or indirectly in the interest of an employer in relation to each of Defendant's employees.

101.    Upon information and belief, each of the Individual Defendants owns (and has owned since the date five years prior to the filing of the initial complaint in this action) a significant portion (each more than 10%) of Defendant.

102.    Upon information and belief, each of the Individual Defendants is (and has been since the date five years prior to the filing of the initial complaint in this action) actively involved in the running of Defendant's business.

103.    Upon information and belief, since the date five years prior to the filing of the initial complaint in this action, each of the Individual Defendants has worked full-time at Defendant's principal place of business (working there most of the working day on most work days), or, in the alternative, worked a substantial amount of time at Defendant's principal place of business.

104.    Upon information and belief, each of the Individual Defendants is (and has been since the date five years prior to the filing of the initial complaint in this action) authorized to issue checks on the Defendant's corporate checking accounts.

105.    Upon information and belief, each of the Individual Defendants is (and has been since the date five years prior to the filing of the initial complaint in this action) authorized to hire and fire truck driver employees.

106.    Upon information and belief, each of the Individual Defendants is (and has been since the date five years prior to the filing of the initial complaint in this action) authorized to set employee schedules.

107.    Upon information and belief, each of the Individual Defendants is (and has been since the date five years prior to the filing of the initial complaint in this action) authorized to establish the amount Defendant's truck driver employees would be paid for their work.

108.    Upon information and belief, each of the Individual Defendants has been aware since the date five years prior to the filing of the initial complaint in this action that Defendant's truck driver employees work more than forty hours in many workweeks.

109.     Upon information and belief, each of the Individual Defendants has been aware since the date five years prior to the filing of the initial complaint in this action that Defendant's truck driver employees are paid by Defendant on a percentage-of-load (effectively a per-ton basis) without any additional compensation to workers for work performed in excess of 40 hours in the workweek.

110.     Upon information and belief, each of the Individual Defendants benefitted as a result of Defendant violating the KWHA and FLSA.

111.     Upon information and belief, Defendant Dallas Jones is and has been since the date five years prior to the filing of the initial complaint in this action a Director of Defendant.

112.     Upon information and belief, Defendant Dallas Jones was the incorporator of Defendant; upon information and belief, Defendant Dallas Jones incorporated Defendant in the year 1984.

113.     Upon information and belief, Defendant Dallas Jones is and has been since the date five years prior to the filing of the initial complaint in this action the President of Defendant.

114.     Defendant listed Dallas Jones as Defendant's President in an MCS-150 filing dated November 4, 2016 in response to the form's instruction to "please enter name(s) of sole proprietor(s), officers or partners and titles (e.g., President, Treasurer, General Partner, Limited Partner)."

115.     Defendant listed Dallas Jones as Defendant's President in an MCS-150 filing dated March 28, 2017 in response to the form's instruction to "please enter name(s) of sole proprietor(s), officers or partners and titles (e.g., President, Treasurer, General Partner, Limited Partner)."

116.     Upon information and belief, Defendant Dana Porter is and has been since the date five years prior to the filing of the initial complaint in this action a Director of Defendant.

117.    Upon information and belief, Defendant Dana Porter is and has been since the date five years prior to the filing of the initial complaint in this action the Treasurer of Defendant.

118.    Defendant listed Dana Porter as Defendant's "Office Coordinator" in an MCS-150 filing dated April 12, 2012  in response to the form's instruction to "please enter name(s) of sole proprietor(s), officers or partners and titles (e.g., President, Treasurer, General Partner, Limited Partner)."

119.    Defendant (through Dana Porter) listed Dana Porter as Defendant's Treasurer in an MCS-150 filing dated November 4, 2016 in response to the form's instruction to "please enter name(s) of sole proprietor(s), officers or partners and titles (e.g., President, Treasurer, General Partner, Limited Partner)."

120.    Defendant (through Dana Porter) listed Dana Porter as Defendant's Treasurer in MCS-150 filings dated November 4, 2016, March 28, 2017 and March 15, 2019 in response to the form's instruction to "please enter name(s) of sole proprietor(s), officers or partners and titles (e.g., President, Treasurer, General Partner, Limited Partner)."

121.    Defendant (through Dana Porter) listed Dana Porter as Defendant's Title as "Controller" in MCS-150 filings dated November 4, 2016, March 28, 2017 and March 15, 2019in response to the form's instruction to enter the title of the person signing the document on behalf of Defendant.

## PROPOSED COLLECTIVE AND CLASS DEFINITIONS

122.    Plaintiff brings Count I of this lawsuit pursuant to FLSA, 29 U.S.C. § 216(b) as a collective action, individually, and on behalf of himself and the following collective:

All current and former truck driver employees of Dallas Jones Enterprises, Inc., doing business as Clay's Trucking, who were misclassified as exempt under the Motor Carrier's Act exemption to the Fair Labor Standards Act and were therefore not paid at an overtime rate of pay

for such employee's work in excess of forty hours in one or more workweeks since December 7, 2017 (the "FLSA Collective").

123.    Plaintiff brings Counts II of this lawsuit as a class action pursuant to Fed. R. Civ. P. 23, individually, and on behalf of himself and the following class:

All current and former truck driver employees of Dallas Jones Enterprises, Inc., doing business as Clay's Trucking, who were misclassified as exempt under the Kentucky Wages and Hours Act and were therefore not paid at an overtime rate of pay for such employee's work in excess of forty hours in one or more workweeks since December 7, 2015 (the "Kentucky Class").

124.    The FLSA Collective and the Kentucky Class are together referred to as the "Classes."

125.    Plaintiff reserves the right to redefine the Classes prior to notice, and thereafter, as necessary.

## COLLECTIVE ACTION ALLEGATIONS UNDER THE FLSA

126.    Plaintiff brings this action under the FLSA on behalf of himself and all similarly-situated current and former employees of Defendant who worked for Defendant and were not fully-paid for their overtime work which Defendant should have paid within the last three years, as defined in Paragraph 95 above.

127.    Plaintiff desires to pursue his FLSA claim on behalf of any individuals who opt-in to this action pursuant to 29 U.S.C. § 216(b).

128.    Plaintiff and the FLSA Collective are "similarly situated," as that term is used in 29 U.S.C. § 216(b), because, *inter alia*, all such individuals worked pursuant to Defendant's previously described common pay practices (of not paying overtime rates of pay to truck drivers, even if they qualified for overtime pay) and, as a result of such practices, were not paid the full and legally mandated overtime premium for hours worked over forty (40) during the workweek.  Resolution of this action requires inquiry into common facts, including, inter alia, Defendant's common compensation, time-keeping and payroll practices.

129.     Specifically, the employment policies, practices and agreements of Defendant raise questions of fact common to the proposed collective group including:

a.       whether Defendant has engaged in a pattern or practice of misclassifying Plaintiff and members of the proposed collective as exempt and permitting or requiring Plaintiff and members of the proposed collective to work in excess of forty hours per workweek for the benefit of Defendant without appropriate compensation, in violation of the FLSA;

b.       whether Defendant has engaged in a pattern or practice of failing to keep accurate records showing all hours worked by Plaintiff and members of the proposed collective, in violation of the FLSA;

c.       whether the conduct of Defendant was willful; and

d.       whether Plaintiff and members of the proposed collective group are entitled to lost wages, liquidated damages and the other relief requested.

130.     Plaintiff's claims are similar to those of the FLSA Collective in that Plaintiff has been subject to the same conduct as FLSA Collective Members and Plaintiff's claims are based on the same legal theory as FLSA Collective Members.

131.     The similarly-situated employees are known to Defendant and are readily identifiable and may be located through Defendant's business records and the records of any payroll companies Defendant uses.

132.     Plaintiff's FLSA claims are maintainable as a collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b).

133.     The similarly-situated employees may be readily notified of the instant litigation through direct means, such as U.S. mail, email, text messaging and/or other appropriate means, and should be allowed to opt into it pursuant to 29 U.S.C. § 216(b), for the purpose of collectively adjudicating their similar claims for overtime and other compensation violations, liquidated damages, interest, and attorneys' fees and costs under the FLSA.

**CLASS ACTION ALLEGATIONS PURSUANT TO FED. R. CIV. P. 23 FOR DEFENDANT'S VIOLATIONS OF THE KWHA**

134.    Plaintiff brings this action under the KWHA on behalf of himself and all similarly-situated current and former employees of Defendant who worked for Defendant and were not fully-paid for their overtime work for which for Defendant which Defendant should have paid within the last five years, as defined in paragraph 96.

135.    Plaintiff is a member of the class he seeks to represent.

136.    Defendant failed to pay Plaintiff and the members of the class he seeks to represent wages for work performed, as described herein, in violation of the KWHA.

137.    Under the KWHA, employers are required to pay overtime compensation to non-exempt employees for overtime work performed by such employees.

138.    As Plaintiff and the similarly-situated employees were non-exempt, Defendant's refusal to pay Plaintiff and Class Members overtime compensation for overtime hours worked violated the KWHA.

139.    Upon information and belief, the Rule 23 Class is sufficiently numerous that joinder of all members is impractical, satisfying Fed. R. Civ. P. 23(a)(1).

140.    All members of the Rule 23 Class share the same pivotal questions of law and fact, thereby satisfying Federal Rule of Civil Procedure 23(a)(2). Namely, all members of the Rule 23 Class share common questions, including: (1) whether Defendant paid them overtime compensation for all overtime worked; and (2) whether Defendant failed to pay them the full amount of overtime compensation earned.

141.    Plaintiff's claims are typical of the claims of the Rule 23 Class, thus satisfying Fed. R. Civ. P. 23(a)(3) typicality.  Defendant's failure to pay Plaintiff overtime compensation was not the result of any circumstances specific to the Plaintiff.  Rather, it arose from Defendant's common pay policies of not paying overtime pay, which Defendant applied generally to their employees,

despite the fact that Plaintiff and the similarly-situated employees were non-exempt and entitled to overtime pay.

142.    Plaintiff will fairly and adequately represent and protect the interests of the Rule 23 Class.

143.    Plaintiff has retained competent counsel experienced in representing classes of employees in lawsuits against their employers alleging failure to pay statutorily required overtime compensation, thus satisfying Fed. R. Civ. P. 23(a)(4).

144.    By failing to pay Plaintiff and Class Members for all hours worked, and failing to pay employees the full amount of overtime compensation earned, Defendant has created the circumstance under which questions of law and fact common to the Rule 23 Class members predominate over any questions affecting only individual members. Thus, a class action is superior to other available methods for fair and efficient adjudication of this matter. Accordingly, Plaintiff should be permitted to pursue the claims alleged herein as a class action, pursuant to Fed. R. Civ. P. 23(b)(3).

## COUNT I

### VIOLATION OF FLSA
### NONPAYMENT OF OVERTIME COMPENSATION

145.    Plaintiff incorporates by reference all preceding paragraphs as if the same were set forth again fully at this point.

146.    Defendant is subject to the wage requirements of the FLSA because Defendant is an "employer" under 29 U.S.C. § 203(d).

147.    During all relevant times, the members of FLSA Collective, including Plaintiff, were covered employees entitled to the above-described FLSA's protections. *See* 29 U.S.C. § 203(e).

148.     The FLSA requires that covered employees be compensated for all hours worked in excess of forty (40) hours per week at a rate not less than one and one-half (1½) times the regular rate at which he is employed.  See 29 U.S.C. § 207(a)(1).

149.     Plaintiff and the FLSA Collective are not exempt from the requirements of the FLSA.

150.     Plaintiff and the FLSA Collective are entitled to be paid overtime compensation for all hours worked over forty (40) in a workweek pursuant to 29 U.S.C. § 207(a)(1) and 29 C.F.R. § 778.112.

151.     Defendant knowingly failed to compensate Plaintiff and the FLSA Collective at a rate of one and one-half (1½) times their regular hourly wage for hours worked in excess of forty (40) hours per week, in violation of 29 U.S.C. § 207(a)(1) and 29 C.F.R. § 778.112.

152.     Indeed, Defendant made no effort to pay overtime compensation at all to Plaintiff and the FLSA Collective, paying them on the same per-ton basis for work performed beyond forty hours per week as it paid them for work performed in the first forty hours of the workweek.

153.     Defendant has willfully violated the FLSA by engaging in a pattern or practice (or patterns or practices) of:

> e.     failing to keep accurate records showing all the time it permitted and/or required Plaintiff and members of the proposed collective to work, from the first compensable act to the last compensable act;

> f.     permitting and/or requiring Plaintiff and FLSA Collective to perform integral and indispensable activities (*i.e.*, work) in excess of forty hours in a work week, for the benefit of Defendant and without compensation at the applicable federal overtime rates; and

> g.     failing to pay employees overtime compensation earned.

154.     Pursuant to 29 U.S.C. § 216(b), employers, such as Defendant, who fail to pay an employee wages in conformance with the FLSA shall be liable to the employee for the unpaid

minimum and overtime wages, an additional equal amount as liquidated damages, reasonable attorney's fees, and costs of the action.

## COUNT II

### VIOLATION OF <u>KY. REV. STAT. ANN. §§ 337.275</u>, *ET SEQ*. <u>BY NONPAYMENT OF WAGES.</u>

155.    All previous paragraphs are incorporated as though fully set forth herein.

156.    Plaintiff bring this claim on behalf of all members of the proposed Rule 23 Class.

157.    Kentucky state law requires that covered employees be compensated for every hour worked in a workweek. *See* <u>KY. REV. STAT. ANN. §§ 337.275</u>, *et seq*.

158.    <u>KY. REV. STAT. ANN. § 337.285</u> requires that employees receive overtime compensation "not less than one and one-half (1-1/2) times" the employee's regular rate of pay for all hours worked over forty in one workweek. *See also* 803 Ky. Admin. Regs. 1:060.

159.    During all times material to this complaint, Defendant was a covered employer required to comply with <u>KY. REV. STAT. ANN. § 337.010(1)(d)</u>.

160.    During all times material to this complaint Plaintiff and the Rule 23 Class were covered employees entitled to the protections of the KWHA. *See* <u>KY. REV. STAT. ANN. § 337.010(1)(e)</u>.

161.    Plaintiff and Class Members are not exempt from receiving the KWHA's overtime benefits because they do not fall within any of the exemptions set forth therein. *See* <u>KY. REV. STAT. ANN. § 337.285(2)</u>.

162.    Defendant has violated the KWHA with respect to Plaintiff and the Rule 23 Class by, *inter alia*, failing to compensate them for all hours worked in excess of forty per workweek at one and one-half their "regular rate" of pay.

163.    In violating the KWHA, Defendant acted willfully and with reckless disregard of clearly applicable provisions of the KWHA.

164.    Pursuant to KY. REV. STAT. ANN. § 337.385, Defendant, because it failed to pay employees the required amount of wages and overtime at the statutory rate, must reimburse the employees not only for the unpaid wages, but also for liquidated damages in an amount equal to the amount of unpaid wages.

165.    Pursuant to KY. REV. STAT. ANN. § 337.385, Plaintiff and Class Members are entitled to reimbursement of the litigation costs and attorney's fees expended if they are successful in prosecuting an action for unpaid wages.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays that the Court:

A.    Issue process and bring Defendant before the Court;

B.    Authorize notice to issue to members of the proposed collective action and permitting similarly-situated persons a reasonable opportunity to join this litigation with respect to claims under the FLSA;

C.    Certify a class of similarly-situated employees whose rights were violated by Defendant under Kentucky law, and grant relief available under Kentucky law, including unpaid wages, liquidated damages, and attorney's fees and other litigation expenses, to the class;

D.    Empanel a jury for the trial of all issues of fact;

E.    Enter a judgment awarding Plaintiff and the Classes damages in the amount of the unpaid overtime compensation, plus liquidated damages in a like amount, in amounts to be proven at trial;

F.      Award Plaintiff and similarly-situated persons joining this litigation all costs of litigation, including expert fees and attorneys' fees;

G.      Grant Plaintiff and similarly-situated persons joining this litigation all costs of litigation and such other further and/or general, legal and/or equitable relief to which they are entitled or which the Court otherwise deems appropriate.

Respectfully submitted,

/s/ Mark N. Foster
Mark N. Foster
Law Office of Mark N. Foster, PLLC
P.O. Box 869
Madisonville, KY 42431
(270) 213-1303
Mfoster@MarkNFoster.com
*Counsel for Plaintiff*